## EXAMINATION OF EXPERT WITNESSES IN WILL CONTEST.

Circuit Court of Cuyahoga County.

MICHAEL J. WALSH, EXECUTOR OF THE WILL OF JOHN WALSH, DECEASED, ET AL v. JAMES A. WALSH.

Decided, December 30, 1910.

*Contest of Will—Cross-Examination of Experts—Evidence of Experts— Comment on Probate of Will.*

1. The rule which requires that one in putting hypothetical questions to his own expert witness must confine his hypothesis to matters upon which evidence has been introduced, does not extend in its full force to the cross-examination of such witness. In cross-examining such expert witness questions may be put based upon some other hypothesis which the cross-examiner hopes to establish by evidence.

2. An expert may not be called upon to say whether one was competent to make a particular will, but only whether, in his opinion, his mental capacity was such as the law requires for the making of a valid will.

3. In a will contest case it is misleading to charge the jury that it is of no importance what the probate judge did in probating the will, and that they are not to be influenced by what he did.

*Green, Zmunt & Zmunt,* for plaintiffs in error.
*Estep & Gott,* contra.

MARVIN, J.; WINCH, J., and HENRY, J., concur..

James A. Walsh filed his petition in the court of common pleas setting out that he, together with Michael J. Walsh and Alice Carey, were the only children and heirs at law of John Walsh, deceased; that Mary Walsh is the widow of said decedent; that said John Walsh died on the 21st day of March, 1908, and that a paper writing purporting to be his last will and testament was admitted to probate in the Probate Court of Cuyahoga County, Ohio, on the 9th day of April, 1908, and averring that the said paper writing is not the last will and testament of the said John Walsh, and praying that an issue be made up, that such paper writing may be set aside as the will of the decedent. The defendants named in the petition are Michael J. Walsh,

as executor of said purported will, Michael J. Walsh, Mary Walsh, Alice Carey, Howard J. Carey and Philip Rayner, guardian of said Mary Walsh.

Upon the trial the jury found that the paper writing was not the will of the decedent; and the parties interested in the establishment of this writing as the will of the deceased, who were made parties in the original proceeding, bring this proceeding in error to set aside the judgment of the court below, which judgment was entered, upon the finding of the jury, as already stated. It developed on the trial that the decedent was severely injured in a railroad accident in the early part of the day on which he died; that immediately after such injury he was taken to St. Alexis Hospital, where he remained until his death, about half past seven o'clock on the evening of the same day; that the purported will was drawn by Frederick Green, Esq., an attorney at law; that the decedent signed by his mark such writing; that such signature was attested by the signature of two witnesses, and this occurred about 5 o'clock in the afternoon of the day of the injury, a little more than two hours before the decedent's death.

The defendant, as required by Section 5864, Revised Statutes, offered the paper writing, purported to be a will, together with the order of probate, and rested his case. This was sufficient to make a *prima facie* case, as provided in Section 5862 of the Revised Statutes, which reads: "On the trial of such issue the order of probate shall be *prima facie* evidence of the due attestation, execution, and validity of the will or codicil." Thereupon this evidence having been offered, as already stated, the plaintiff below proceeded to introduce evidence tending to show that by reason of the injury which the decedent received on the morning of this day, and from which he died in the evening, he had not mental capacity sufficient to make a valid will.

We are asked to reverse this case on the weight of the evidence. This, we can not do. The evidence was conflicting; there was a great amount of it, both expert and other evidence, and we are not prepared to say that the jury clearly went wrong in reaching the conclusion that the writing was not the will of the decedent, because of mental incapacity on his part at the

time of its execution. But there was error in this trial which requires a reversal. Among the witnesses called on the part of the contestors was Dr. Wm. F. Golling, who qualified as an expert, and testified as such, and in answer to hypothetical questions put to him, testified that he did not regard the decedent as competent to make a will at the time this was executed. Dr. Golling saw the decedent where he was in the hospital, after the injury and before the execution of the writing. On cross-examination he was asked a number of questions, as appears by reference to page 52 and following, up to 54, in the bill of exceptions, which he was permitted to answer. Among these, are the following:

"Q. Suppose for instance, that he (speaking of the decedent) should say that he wished his daughter to hold a particular piece of property in a certain manner during the lifetime of her husband, after the husband's death to own it absolutely, what would such directions of his indicate as to his mental condition?"

The answer was:

"That would be all right; I would think that he was able to do business as far as that goes."

That was followed by the question "That he was possessed of sound and disposing mind and memory," which was answered by "Yes, sir, that his memory was very good." Another question was as follows: "Your conclusion, doctor, was based upon your observation of the patient?" And the answer was "Yes, sir." This was followed by several questions and answers, to-wit:

"Q. And the fact that he died within several hours afterwards? A. Yes, sir.

"Q. Although it is true that persons retain control of their mental faculties somewhat up to within practically the moment of their death? Is that not true? A. But this is not sickness, disease.

"Q. But in cases of shock, I take it, from what you say? A. I don't think it would wholly come from things which you have been asking me about, that is something I can't tell. I only saw him from the time he left Bedford. I don't think he was able to make a will at the time I saw him, and he got worse and died soon after I saw him, and so far as these little

questions you have been asking me, I am not competent to answer those questions because I didn't see the man; I don't know when he made the will; I don't know anything about it.''

After answering this and other questions upon cross-examination the doctor was re-examined by counsel for the contestants, and then the court said to the jury:

''Gentlemen of the jury, the doctor was permitted to answer some hypothetical questions put to him by Mr. Green and I take it from your consideration. The questions were misleading, I think, and therefore you are not to consider them.''

To this action of the court counsel for the contestees excepted. The Mr. Green spoken of by the court was such counsel. This action of the court was erroneous for two reasons: One that it was indefinite as to what was taken from the jury, and it was also erroneous because the contestees had a right to an answer from this expert witness on these hypothetical questions. The writing was already in evidence. That writing purported to make bequests such as were spoken of in the hypothetical questions.

That writing was *prima facie* the act of this decedent, hence there was evidence tending to show that the decedent had done the things suggested in the hypothetical questions. But even if that were not true, the rule which requires that one in putting hypothetical questions to his own expert witness must confine his hypothesis to matters upon which evidence has been introduced, does not extend in its full force to the cross-examination of such witness. In cross-examination, questions may be put to the witness based upon some hypothesis other than that which the party producing the witness has introduced evidence tending to support. If this were not true a party might introduce evidence in chief tending to support certain propositions of fact, and then introduce an expert witness and ask him hypothetical questions based upon the facts which the previous evidence had tended to establish, and the adverse party would be left without the opportunity to know what the evidence of the witness would be upon another set of facts, which it may be that this adverse

party hopes to establish. Such cross-examination, too, is permissible to test the witness who has been offered as an expert. Examining the bill of exceptions at page 116 we find that Dr. Thomas A. Burke, as a witness called on the part of the contestors, was being examined. He had qualified as an expert and then various hypothetical questions were put to him, and among them the following:

"Now doctor, suppose the case as I have stated it to you, and in the case I have stated to you it is claimed that about five o'clock that same afternoon this man was claimed to have made a will, substantially as follows in its material aspects. Item 2 of the will he undertook to give to his daughter, one of his daughters, during the life of her husband the place in which he then lived, situated in Bedford township, in this county, except the gas well located on the place, and another parcel of land owned by him in the village of Newburgh, consisting of ten acres of land, and then on the death of her husband he said the place in which he then resided was to go to his daughter absolutely and she was also to have the place in South Newburgh, subject to the following conditions: Should she desire to dispose of the said piece of land, his son, Michael J. Walsh, was to have the right to purchase it for the sum of $1,000. That Michael Walsh was to have the use of the gas well on the place where John Walsh resided, and as long as he lived and if he should die leaving lawful issue, such issue shall have the use of it during their lives, then in the next item he gives to his son Michael Walsh the farm where he resided in South Newburgh, then in the next item he undertook to make a trust estate providing that all the rest of the household goods and farming implements shall be bequeathed to his son Michael in trust for the following provision: Converting all the goods into money and pay the income from $3,000 annually to his daughter Alice Carey during the life of her husband, the income of the balance of the property to be paid to his wife during her natural life. Then he provided that on the death of her husband, he shall pay Alice Carey $3,000, then he provided that on the death of his wife, he shall pay one-half of the balance to the son James, and retain the other half himself. Then, he provided in another item his daughter Alice was to have the use of the farm implements and stock, and should she not desire to use them, they shall be sold to the son Michael Walsh, and the proceeds become a part of the trust fund. Then, his wife was to have the household goods. Now, doctor, what do you say as to a man in the condition I have already described to you in my previous question, having a sound

and disposing mind and memory to such an extent as to enable him to make this will I have outlined to you?''

This question was objected to by counsel for the defendant and the objection overruled, and exceptions taken, and the witness answered: ''I think it is covered in my previous answer. It is impossible to have a sound and disposing mind and memory; it would apply to that as well.'' The objection to this question should have been sustained. It assumes too much, and the answer of Dr. Burke both to this question and to the question following, showing that he understood it, and that the question involved not necessarily the capacity of the party spoken of to make a will, but that it would require, as the doctor put it, in answer on page 118 (bill of exceptions) ''A wonderful mind.'' He says on the same page, that to make such a will as that would require a better mind than the ordinary man possesses. A remarkably clever mind. It was not necessary that the defendants should show here that the decedent was a man of extraordinary mind or that he was competent in making a given kind of will so far as mental capacity was concerned; it was sufficient for them to show that he had such a mind and memory as the law makes sufficient for the disposition of his property by will. It is not to be supposed that this man, who was an uneducated man, or than any uneducated man would be able to express in proper terms just how he would want trust estates held, and plan it all out by means of various things that he might want done with his estate in the way of being held for parties during minority, or being held for charitable purposes for a time, or the like, and for that reason, lawyers are called on to do the writing for one's will. It is true that if what they write does not express what the testator wants, it is not his will, but if he learns that the testator wants property held, as suggested in this question, that the income from a certain $3,000 should be paid annually to a daughter during the life of her husband, the income from the balance of such property to be paid to his wife during her natural life, and that he wanted Alice Carey to have the $3,000 if she outlived her husband, and the like, then the words to be used to carry out these various desires of the testator might be the words of the

lawyer who might be called upon to write the will.   It may very well be that the testator did not know how to use the words.   It may be very well said that he did not know just how trusts may be created, and the like, and as Dr. Burke very well says, it would require a remarkably clever man to properly express all these things   But is it possible that a man of sound and disposing memory, though not a remarkably clever man, is not competent to execute a valid will because he is not able for want of education and for want of knoweldge of the law to know how his wishes shall be carried out, and is thereby incompetent to make a will?   We know of no authority for the proposition that an expert may be called upon to say whether one was competent to make a particular will.   It is only a question of whether his mental capacity was such as the law requires for the making of a valid will, as has already been stated.   The experience of the lawyers in courts justifies the saying that a will which simply provides "I give and bequeath all of my property of every kind and nature to my beloved son John," is one likely to be other than the real will of the testator, as the most complicated will that one can think of.

Again, the court erred in its charge to the jury in the use of these words (the court was speaking of the effect of the order of the probate court, the incumbent of which was Judge Hadden, admitting this will to probate):

"So that what Judge Hadden, as probate judge, did with this will is of no importance, except that by force of the statute it became *prima facie* evidence of the due attestation, execution and validity of the will, and cast the burden upon the contestor of showing that it was invalid.   Except for that, this case is heard anew, and you should not be influenced by what Judge Hadden did.   Counsel may not have been present, and, if present, had no absolute right to be heard, whereas in the contest here, all parties have a full right to be heard.   The proceeding here is in the nature of an appeal from the order of the probate court, and all the material facts are produced, just as if Judge Hadden had not made such an order, except as the statute directs that such an order is, *prima facie*, evidence of the will's due attestation, execution and validity, the burden being upon the contestants to invalidate it."

This language is calculated to mislead the jury, for two reasons. He has said that what Judge Hadden did is of no importance. True, he follows that by saying:

"Except by force of the statute, it became *prima facie* evidence of the due attestation, execution and validity of the will, and cast the burden on the contestor of showing that it was invalid * * * and you should not be influenced by what Judge Hadden did."

Now that may be so analyzed as to mean that except establishing the fact that the burden of showing the invalidity of the writing as a will was upon the contestor, the order of probate was of no account, or it may be construed to mean, and was very likely so construed by the jury, that the fact that the will had been admitted to probate was not to be considered by them as establishing any proposition. The danger that it may be so understood follows from the language "and you should not be influenced by what Judge Hadden did" and then the court goes on to give the reasons why they should not be influenced by what Judge Hadden did, and states that they should be influenced to the extent that such order made by the probate judge by force of the statute established *prima facie* evidence of the due attestation, execution and validity of this writing, as a will.

For error in the rulings on evidence, and because of the misleading character of the charge, in the words pointed out, the judgment of the court of common pleas-is reversed, and the cause remanded.